In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00118-CV
______________________________


CHARLES "JACK" WATSON, Appellant
 
V.
 
FROST NATIONAL BANK, Appellee


                                              

On Appeal from the County Court at Law
Gregg County, Texas
Trial Court No. 2001-32-CC


                                                 



Before Morriss, C.J., Ross and Cornelius, *JJ.
Opinion by Justice Cornelius

____________________________________
*William J. Cornelius, Chief Justice, Retired, Sitting by Assignment 


O P I N I O N

            Charles "Jack" Watson appeals an adverse summary judgment rendered by the Gregg County
Court at Law in Frost National Bank's suit to collect a deficiency due on a retail installment note
after acceleration and sale of collateral.
            On February 8, 1997, Watson executed a vehicle retail installment note to Bass Chevrolet
Company to finance the purchase of a 1994 Chevrolet S-10 truck. The note was payable in
installments and was secured by a security interest in the vehicle. Bass Chevrolet assigned the note
and security interest to Frost National Bank. Watson subsequently defaulted in the payment of the
installments. The Bank notified Watson of the default, accelerated the installments, and sold the
collateral on February 4, 1998. On January 5, 2001, the Bank filed suit against Watson, seeking a
judgment for the amount of the debt remaining after the proceeds from the sale of the collateral had
been credited and for attorneys' fees. Watson answered the suit, raising a general denial as well as
other defenses, including limitations. The answer had a verification attached to it, but the
verification was never signed or acknowledged.
            On October 1, 2002, the Bank filed a traditional motion for summary judgment. See Tex.
R. Civ. P. 166a. The motion alleged that there was no genuine issue of fact and the Bank was
entitled to judgment as a matter of law. The motion had attached to it copies of the note and security
agreement, and affidavits containing summary judgment evidence on all elements of the Bank's
cause of action, including attorneys' fees. Watson failed to file a response to this motion. On
October 22, 2002, the trial court granted the Bank's motion for summary judgment. Sometime later,
Watson filed a motion for new trial, alleging he did not receive notice of the hearing on the Bank's
motion  for  summary  judgment.  The  trial  court  granted  Watson's  motion  for  new  trial  on
December 12, 2003.
            On July 2, 2003, the Bank filed a motion for a "no-evidence" summary judgment. See Tex.
R. Civ. P. 166a(i). Watson filed a response to this motion, but all his assertions and arguments were
contained in the response itself, and he did not present any summary judgment evidence, either
supporting his defenses or contradicting the Bank's summary judgment evidence supporting its
claims.
            On July 7, 2003, the trial court set a hearing for August 14, 2003, on both the Bank's
traditional motion for summary judgment and its no-evidence motion for summary judgment. After
the hearing, the trial court rendered summary judgment in favor of the Bank on all issues. We will
affirm the judgment.
            The trial court properly rendered summary judgment in favor of the Bank. At the time the
trial court considered summary judgment, there were two motions pending, both filed by the Bank. 
One was a traditional motion for summary judgment, and the other was a no-evidence motion. See
Tex. R. Civ. P. 166a(c), (i). These motions addressed all elements of the Bank's causes of action,
as well as Watson's alleged defenses of limitations, laches, estoppel, accord and satisfaction, waiver,
lack of commercially reasonable sale, and lack of adequate proceeds from the sale of the collateral. 
Watson responded to the no-evidence motion for summary judgment, but supported the response
with no summary judgment evidence whatever. Because Watson did not produce any summary
judgment evidence in response to either of the Bank's motions, the trial court was required to render
summary judgment for the Bank. See Tex. R. Civ. P. 166a(c), (i); Dubois v. Harris County, 866
S.W.2d 787 (Tex. App.—Houston [14th Dist.] 1993, no writ).
            Watson argues that, because in his response he referred to facts that showed limitations
barred the Bank's suit, he raised a fact issue on that question and summary judgment was improper. 
We disagree. Watson only raised this alleged fact in his pleadings and in his response. Neither
pleadings nor responses to summary judgment motions constitute summary judgment evidence. 
Laidlaw Waste Sys., Inc. v. City of Wilmer, 904 S.W.2d 656, 660 (Tex. 1995); Smith v. Hennessey
& Assoc., Inc., 103 S.W.3d 567, 569 (Tex. App.—San Antonio 2003, no pet.).
            Moreover, the record, the summary judgment evidence, and Watson's own brief in this appeal
conclusively show that Watson's allegation of the date the suit was filed, April 11, 2002, is incorrect
and the suit was actually filed on January 5, 2001. Thus, the action was not barred by either the four-
or the six-year statute of limitations. See Tex. Bus. & Com. Code Ann. § 3.118 (Vernon 2002);
Tex. Civ. Prac. & Rem. Code Ann. § 16.004(3) (Vernon 2002).
 
 
 
            We affirm the judgment of the trial court.
 
                                                                                    William J. Cornelius*
                                                                                    Justice

*Chief Justice, Retired, Sitting by Assignment

Date Submitted:          April 20, 2004
Date Decided:             June 30, 2004
 









knew what she did. She admitted using drugs, but also testified she had
lied about using drugs when she was placed in a drug rehabilitation program. She denied
failing to go to additional therapy recommended by the program counselors.
          Holli also admitted she knew Clark was a registered sex offender, but further
testified she knew he did not do the acts resulting in his status as a sex offender. She
denied having sex with Clark. Holli acknowledged D. R.'s sexual behavior and stated that
her problems were the result of having the same genetic problems as herself. She also
testified D. R. lies all the time. Holli denied that the children ever went without food and
denied that she and Keith had a chaotic lifestyle. In her view, the children had a stable life
before CPS "started butting in my business." 
          Kelly Smith, a counselor who provided therapy for D. R. and H. R., testified the
children's play reflected themes of killing, death, and violence, which was consistent with
exposure to domestic violence. Smith further testified that D. R. had told her about a great
deal of domestic violence, that D. R. had watched sexually explicit material on television
with her parents and that D. R. wanted to be a stripper like her mother. Contrary to Holli's
testimony that she did not know Smith, Smith testified she and Holli had talked together
about a half dozen times. Smith further stated H. R. was behaving in a violent and
aggressive fashion at school and on the school bus.
          Gail Gulley, the children's guardian, testified she had been unable to contact Holli
and Keith outside the courtroom because they had moved without providing any
information. 
          All of the Department's witnesses testified they believed it would be in the best
interests of the children to terminate parental rights. 
          Some of the evidence before the court was in conflict. The question before this
Court is whether the evidence, examined in the light most favorable to the finding, is such
as to be legally sufficient to support the verdict. The credibility of the witnesses and their
testimony is a matter for the fact-finder, and the evidence contrary to the verdict in this
case is not such as to be inherently incredible. As set out above, there is evidence the
children were knowingly placed in a home with a sex offender and evidence of extensive
family violence over a period of years. There is evidence the children were exposed by
both parents to sexual activities and pornography far beyond anything appropriate to their
age and evidence of sexually charged behavior by both children reflecting the exposure. 
There is evidence that both parents regularly used drugs and that they did so in the
presence of the children. There is evidence of the mental and emotional instability of Holli
and of her predilection to behave violently. There is evidence about extensive arrest
records for both parents, as was most clearly shown by the fact that both parents were in
jail at the time of this trial. 
          The Texas Supreme Court has set out nine nonexclusive factors that a court may
consider in determining whether termination is in a child's best interest. They include the
child's desires, the child's emotional and physical needs now and in the future, the
emotional and physical danger to the child now and in the future, the parenting abilities of
the parties seeking custody, the programs available to assist those persons, the plans for
the child by the parties seeking custody, the stability of the home or proposed placement,
the acts or omissions committed by the parent that may indicate that the existing parent-child relationship is not proper, and any excuse for the acts or omissions committed by the
parent. Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976); In re A.B., 125 S.W.3d 769
(Tex. App.—Texarkana 2003, pet. denied). 
          D. R. stated she wanted to live elsewhere; H. R. stated otherwise. It is clear from
the history of the family unit that neither child's emotional or physical needs were being
met, and it is equally clear that both children were being severely emotionally damaged by
the behavior of their parents, both in their relationship and the parents' apparent
indifference to the actions toward their children of the adults with whom they kept company. 
The programs available had been used with little long-term effect. Because of the
incarceration of both parents and the possibility of continued imprisonment, long-term
plans would not be possible within the family, and no real alternatives were suggested. 
The evidence shows serious instability, both physically and emotionally, in the home in the
past, and a high probability of such instability in the home in the future. The evidence is
legally sufficient to allow a reasonable fact-finder to have formed a firm belief or conviction
that its finding was true.
          We affirm the judgment.

                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      March 23, 2005
Date Decided:         May 26, 2005